FILED
2008 Jun-30  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARSHENE P. NELSON** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **4:07-cv-2126-UWC** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act,

42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of

the Social Security Administration ("SSA").  This Court finds the SSA failed to fully

develop the record.  Accordingly, the Court will REVERSE and REMAND the decision

denying benefits.

### I.  Procedural History

Plaintiff filed an application for supplemental security benefits in July 2005.  (R.

16.)  This application was denied administratively at the initial and reconsideration stages.

Plaintiff requested a hearing before an ALJ, which was held on October 4, 2006, in

Gadsden, Alabama.  (R. 16.)  On March 15, 2007, the ALJ denied the claim. (R. 23.)

1

This denial became the final decision of the Commissioner of the SSA when the Appeals Council refused to grant review on September 28, 2007.  (R. 4.)  Having timely pursued and exhausted her administrative remedies, Plaintiff filed an action for judicial review in Federal District Court pursuant to section 1631 of the Social Security Act, 42 U.S.C. § 1383(c)(3).

## II.  Factual Background

At the time of the hearing, Plaintiff was a 45 year-old woman with a GED.  (R. 207.)  Plaintiff has past relevant work experience as a nursing aid and house cleaner.  (R. 208.)  Plaintiff has not engaged in substantial gainful activity since 1996.  (R. 208.)  She suffers from low-back pain and knee pain.  The record also indicates Plaintiff is overweight.

Plaintiff fell in March of 2002, after which her radiology report showed minimal underlying degenerative changes in her knee, but no visible acute process.  (R. 105.)  When she began treatment with Dr. George J. Douthit, an orthopaedic surgeon, she continued to complain of pain.  (R. 101.)  An MRI performed on May 7, 2002, suggested enchondroma [1] of the distal aspect of the femur, but no obvious tear.  At this point no operation was needed and she was given a prescription for Darvocet.  (R. 99.)  Several weeks later, Plaintiff visited with Dr. Kenneth A. Jaffe, an orthopaedist who specializes in spine diseases and disorders.  At this point her knee was tender, but there was no fluid.

---

[1]  An enchondroma is a non-cancerous tumor that appears on the inside of a bone.

2

(R. 113-4.)

Around this same time, Plaintiff was treated by Dr. Michael Scott Kendrick, who specializes in pain management. Plaintiff reported occasional low-back pain radiating down to her left leg and foot, as well as intermittent numbness and tingling. Apparently she had undergone some injections which helped some. However, the pain sometimes caused difficulty sleeping. She also had some pain on rotation of her neck and mild tenderness in her lower back. Dr. Kendrick reported no indication of pain magnification. He recommended conservative pain treatment with medication: Ultracet. (R. 130.)

When she returned to Dr. Kendrick she continued to complain of pain, despite the pain medication. Plaintiff reported the pain medication only eased the pain somewhat. Overall, however, her mobility was good. (R. 129.) Approximately one month later, she still complained of knee and lower back pain. While she reported some improvement with medication, the effect of the pain medications did not last until the next scheduled dose. She was in no acute stress and her overall mobility was good. Dr. Kendrick encouraged her to walk as much as she could. (R. 127.)

In June, Plaintiff reported to Dr. Douthit continued pain when walking, bending or standing. By August, she continued to complain of pain and Dr. Douthit noted she elected to go to physical therapy. However, he noted that surgery might be necessary if therapy was unsuccessful.

Plaintiff began physical therapy on August 22, at which time she reported pain at a

3

seven out of ten.  Mild swelling was noted over the knee, as well as pain if pressure was applied.  Her range of motion was limited and her quad strength was three out of five.  She had not been able to work.  The therapist noted Plaintiff was fairly motivated, but apprehensive secondary to pain.  (R. 90.)  She returned to therapy five days later and did well, but cancelled or was a no show for her next two appointments.  (R. 87.)   She did well in therapy again on September 5, but was a no show for her next two appointments.  (R. 87.)  On September 19, she had no complaints following therapy, but cancelled her next appointment.  (R. 87.)

By September 23, she continued to complain of knee pain and was re-evaluated.  The therapist noted Plaintiff's range of motion had improved and her condition improved when she came to therapy.   (R. 87-88.)  She was a no-show for her next therapy appointment.  (R. 86-7.)

 On September 30 she returned to see Dr. Jaffe and reported she was still having a significant amount of pain.  He noted pain and tenderness, but no full range of motion and no fluid.  She was given a Coritizone injection.  (R. 112.)  Around this same time, she reported to Dr. Douthit that therapy helped "some."  (R. 95.)  She was a no-show for her next therapy appointment.  On October 3 and 8 she returned to therapy and noted her knee continued to hurt.  (R. 86.)  She was a no-show on October 7, but had no complaints prior to therapy on October 9.  (R. 86.).

She was a no-show for therapy on October 10, but called into Dr. Jaffe's office on

4

October 11 and obtained a prescription for Darvocet.  (R. 111.)  She was feeling better when she went to therapy on October 15.  She cancelled her October 17 therapy appointment, but returned on October 18.  On October 21, she returned to Dr. Jaffe's office.  He recommended she get a scope to contain the tumor and re-filled her Darvocet. (R. 109.)  On November 8, Dr. Douthit performed the recommended surgical procedure where the fibourus tissue was removed from the tumor.  (R. 93, 102.)  At her follow-up visit on a few days later, he advised Plaintiff that she could return to work in two weeks. (R. 93.)

A few days later, on November 13, she had another physical therapy evaluation, during which the therapist noted Plaintiff's incision was healing well.  Her knee was tender, swollen and warm.  She had decreased muscle tone and limited range of motion. She was ambulating with a crutch and had decreased stance, but she seemed well motivated.  (R. 82.)  She had no complaints when she returned for physical therapy on November 15, but cancelled on November 19.   The following day her range of motion had improved, but she still had significant pain in the knee and she was 60% deficient on biodex testing.  (R. 80.)

On December 3, she cancelled her physical therapy appointment.  However, the following day her therapist noted that Plaintiff's knee was feeling better and that she had been doing her home exercises.  (R. 79.)  She cancelled her next appointment, and reported increased pain when she began therapy on December 10.  However, at the end of

the session she felt better.  (R. 78.)  She was a no-show on December 12, but returned the following day with no complaints prior to and after therapy.  (R. 79.)  Approximately five days later, she complained her knee was hurting "worse," but reported no complaints after therapy.  (R. 78.)  The following day her knee hurt significantly and she was re-evaluated.  (R. 78.)  Upon re-evaluation her strength was worse than the last test based on biodex testing.  She had 88% deficient quadriceps and 70% deficient hamstrings.  Her range of motion improved from 0 degrees to 111 degrees.  (R. 76.)  The therapist then sought direction from her physician regarding continuing therapy.  It is unclear what her physician recommended.  However, she did have an appointment for January 2, 2003, which she cancelled.  (R. 76.)

On January 3 she visited Dr. Jaffe and reported she still had significant pain.  There were no signs of infection or instability and she essentially had full range of motion.  He gave her an injection.  He noted that her pain was not located near the site of the surgical procedure.  (R. 109.)

On March 3, 2003, she returned to Dr. Jaffe and was not doing great due to pain.  She also lacked energy.  There was mild grating or cracking in the knee, no fluid and no soft tissue mass.  He recommended trying a series of injections before any type of surgical procedure and prescribed Vicodin because of problems with Darvocet.  (R. 107.)

Over two years later, on August 9, 2005, Plaintiff sought treatment from the PWCC pain center, due to throbbing pain, as well as tingling and numbness.  Plaintiff's

6

active range of motion showed functional limitations in her lower extremities. Her muscle tone was within normal limits, but there was tenderness to palpation in the left knee and in the lower back.  The mass in her knee was larger than on previous MRI reports.  After checking with Dr. Connor, a pain management specialist, the examining medical professional recommended increasing the Lortab until approval could be obtained for Duragesic.  The examining professional noted that they would like to postpone orthopaedic referral until Plaintiff could obtain health insurance.  They also recommended delaying surgery for a few months and, if Plaintiff could not obtain health insurance, she would then be referred to a charity program at University of Alabama Hospital.  During this visit, Plaintiff reported rest and Lortab relieved the pain, but she needed something for sleep.  (R. 171.)

Plaintiff returned several weeks later complaining of intermittent pain knee pain and radiating lower back pain.  Her medications were working good, but Dr. Connor prescribed a cane.  (R. 169-70.)

On September 10, 2005, Plaintiff submitted to a examination by consulting physician Dr. Naveed Vehra, an internal medicine physician.  Dr. Vehra noted some tenderness and trigger points on the left knee and low-back.  Her lumber flexion was limited to 40 degrees.  She was unable to perform heel to toe on her left side.  He determined that Plaintiff could sit six hours a day.

Plaintiff visited Dr. Connor on approximately fourteen occasions from October 2005 through October 2008.  On these visits, Plaintiff routinely reported her medications, including Duragesic which is indicated for moderate to severe pain, were effective or okay.  (R. 167-200.)  Indeed on one occasion, she reported the medications were very effective.  (R. 180.)

During this time, Plaintiff complained of depression and requested a medication sample.  There is no indication she was referred for mental health treatment.  (R. 182.)

On April 17, 2007, Dr. Connor completed a Food Stamp program request for medical information.  On that form Dr. Connor indicated Plaintiff has been diagnosed with lower back pan, knee disease and anxiety/depression.  Finally, Dr. Connor indicated that Plaintiff is not able to work and that her condition is permanent.  (R. 201-2.)

At the administrative hearing, Plaintiff testified that her knee tumor cuts off circulation and causes pain.  Consequently, she can only stand approximately thirty minutes to an hour and can walk approximately one half block.  She must frequently elevate her leg and rest five to six times a day for approximately thirty minutes.  Even when she is on medication, she frequently experiences pain.  (R. 209-14.)

After the administrative hearing, the ALJ found that Plaintiff suffers from low-back pain, osteoarthritis, obesity and osteochondroma of the left knee.  (R. 28.)  The ALJ further found that because of Plaintiff's impairments, she could not perform her past relevant work. (*See* R. 21.)  However, Plaintiff could perform light work.  (R. 21.)  The

ALJ based this determination on several factors.  Specifically, Dr. Connor's opinion about Plaintiff's ability to work seemed to conflict with Dr. Connor's treatment notes which indicated Plaintiff's medications were effective.  With respect to Plaintiff's anxiety and depression, the ALJ noted that this condition is only mentioned a few times and the records indicate she obtained medication.  There is nothing to indicate continued treatment or referral for mental health treatment.

### III.  Controlling Legal Principles

A disability claimant has a heavy, but not insuperable, burden to establish entitlement to benefits.  *Mims v. Califano*, 581 F.2d 1211, 1213 (5th Cir. 1978).  The district court's standard or scope of review is limited to determining whether the substantial evidence support's the Commissioner's decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  Additionally, the Court must determine whether proper legal standards were applied.  *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997) (citing *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987)).

Substantial evidence is more than a scintilla, but less than a preponderance.  It is such evidence a reasonable mind would accept as adequate to support a conclusion.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  In contrast, the Commissioner's legal conclusions are more closely scrutinized.  "The [Commissioner's] failure to apply the correct law or to provide the reviewing Court with the sufficient reasoning for determining that the proper

legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 969 F.2d 1143, 1145-45 (11th Cir. 1991).

Applicable agency regulations require a sequential evaluation of adult disability claims. 20 C.F.R. § 404.1520 (1983). The first consideration is whether the claimant is working. If the claimant is working, she is not disabled. If the claimant is not working, the Commissioner must determine whether the claimant suffers from a severe impairment. If the claimant does not suffer from a severe impairment, she is not disabled. If the claimant suffers from a severe impairment, then the Commissioner must consider whether the claimant meets any of the listings in 20 C.F.R. pt 404, subpt P, app. 1 ("Listing"), which details "impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 404.1520(a). *See Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985). If the claimant's medical profile meets the criteria for an impairment in the "Listing," then the claimant is disabled by law and no further inquiry is necessary.

The burden is on the claimant to show that she meets the criteria under the listing. To meet the listing, the claimant must be (1) diagnosed with a condition that is listed or its equivalent, and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and duration requirement. *See Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

When a claimant's "severe" impairment does not fall within a Listing, but

nonetheless restricts her ability to perform basic work activities, the ALJ must then assess the claimant's residual functional capacity and the range of work activities that the claimant could perform despite his impairments.  This evaluation must give consideration to claimant's subjective complaints, accounting for nature of pain, medication, treatment, functional restrictions, claimant's daily activities, and other relevant factors.  20 C.F.R. § 404.1512.

Additionally, pursuant to 20 C.F.R. § 404.1523, the ALJ is required to consider the disabling effect of multiple impairments:

> In determining whether your physical or mental impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all your impairments without regard to whether any such impairments if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medially severe combination of impairments, we will determine that you are not disabled.

Pain alone can be disabling.  When a claimant claims disability based solely on pain, a three-part standard is utilized in assessing the credibility of his testimony.  The claimant must establish evidence of an underlying impairment and either: (1) objective medical evidence to confirm the severity of pain alleged, or (2) a finding that the impairment is of such a severity that it can be reasonably expected to cause the pain alleged.  *See, e.g.*, *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992) (emphasis added).

## IV.  Analysis

This Court must reverse and remand the Commissioner's decision for failing to fully develop the record.  First, the SSA did not seek clarification from Dr. Connor regarding the apparent discrepancies between the scant notations in Plaintiff's medical records and Dr. Connor's opinion about Plaintiff's ability to work.  The Court notes that the medications prescribed by Dr. Connor, the apparent notations regarding a cane, and the recommendation regarding further surgery do appear consistent with Dr. Connor's conclusion that Plaintiff is unable to work.  Additionally, further development of the record is necessary because Dr. Connor's evaluation of Plaintiff did not contain information about her actual abilities.  Rather, the evaluation only contained a conclusory statement about Plaintiff's ability to work.  Additionally, rather than relying on Plaintiff's testimony, the SSA should have obtained a medical opinion about whether surgery was warranted and any prognosis for post-surgical recovery.  Obviously, a need for surgery might provide evidence that Plaintiff's condition is as serious as she maintains.  Finally, it is noteworthy that Dr. Connor is not an orthopaedist, nor was the consulting physician.  Yet, at one point, Plaintiff was treated by two orthopaedists, Dr. Douthit and Dr. Jaffe.  Opinions from either of these physicians might have proved more useful in determining the level of Plaintiff's ability or disability.[2]

Therefore, by separate order, the decision denying benefits will be reversed and

---

[2]  The Court notes that the record does not support the conclusion that Plaintiff's anxiety and depression are disabling.

12

remanded for further proceedings.

      Done this 30th day of June, 2008.

U.W. Clemon
United States District Judge